AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Jill Hardie, being duly sworn, depose and state that:

1.      I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since September 2016.  I currently am assigned to the New England Field Division's Task Force 1 located in the Boston Office.  Prior to my employment as a Special Agent, I was employed as a DEA Diversion Investigator from May 2012 to August 2016.  As a Diversion Investigator, I was assigned to the DEA Boston Tactical Diversion Squad, a task force created to disrupt and dismantle those suspected of diverting licit pharmaceuticals and/or chemicals.  Prior to my employment with DEA, I was employed an Intelligence Analyst at the New York/New Jersey High Intensity Drug Trafficking Area (HIDTA) under Homeland Security Investigation's El Dorado Task Force for three years.

2.      As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  I have received training regarding narcotics investigations while attending the Basic Agent Academy in Quantico, Virginia, and have attended additional specialized training courses in furtherance of my past and current assignments.

3.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I have also reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I have also become familiar with the manner in which narcotics organizations utilize various

forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4. Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

5. I submit this affidavit in support of a Criminal Complaint charging Alvaro MARTINEZ with violating Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute 40 grams or more of fentanyl).

6. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the DEA and other federal, state, and local law enforcement agencies. I have also reviewed information from a variety of additional sources, including confidential sources of information, and consensually recorded telephone calls. For the reasons set forth herein, I believe there is probable cause to believe that MARTINEZ, and others have committed violations of Title 21, United States Code, Sections 846 conspiracy to possess with intent to distribute fentanyl.

7.      This Affidavit is submitted for the limited purpose of establishing probable cause to believe MARTINEZ has committed the above offense. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

Probable Cause

8.      Since April 2019, the DEA has been investigating MARTINEZ, a suspected fentanyl dealer distributing in the area of Lynn, Massachusetts.

9.      Investigators obtained information about MARTINEZ from a confidential source (hereinafter, "CS-1"). CS-1 began cooperating with law enforcement in 2019 in exchange for monetary compensation. CS-1 has no criminal record. CS-1's cooperation has led to the successful purchase of drugs. However, in late July 2019, CS-1 told investigators about illegal activity that CS-1 engaged in without authorization. Specifically, CS-1 brought another individual to an address in New York for the purpose of picking up narcotics. At that location, CS-1 assisted in counting out fentanyl pills for the purposes of delivery to an associate of CS-1. CS-1 admitted to knowing about the narcotics trafficking activities of that associate but hiding that information from CS-1's handlers. CS-1 stated that the narcotics trafficking activities of that individual may have resulted in an overdose death. According to CS-1, CS-1 made this recent disclosure to investigators because CS-1 was upset about the overdose death referenced above.

10.     Investigators believe that CS-1 may still be minimizing his/her involvement with the above-referenced overdose death. Investigators intend to deactivate CS-1 from active work with DEA, subject to further consultation with other law enforcement officials. However, notwithstanding this disclosure, investigators believe that information provided by CS-1 pursuant

to this investigation is reliable. Specifically, information provided by CS-1 during the course of this investigation has been corroborated both through surveillance and through recorded calls made by CS-1 to the targets of the investigation.

11. On or about April 2, 2019, CS-1 provided information about a fentanyl source of supply in Lynn, Massachusetts. CS-1 knew this individual as Bori. According to CS-1, Bori knows a female source of supply in the Boston area who could get any quantity of fentanyl that CS-1 would need. On or about April 4, 2019, CS-1 contacted law enforcement and stated that CS-1 had subsequently learned that Bori's real name was Alvaro MARTINEZ.

### April 30, 2019 – CS-1 contacted MARTINEZ and later buys approximately 25 grams of fentanyl from MARTINEZ and ANTHONY LNU

12. On April 30, 2019, agents met with CS-1 for the purpose of attempting a controlled purchase of fentanyl from MARTINEZ. At approximately 2:45 p.m., CS-1 placed a recorded WhatsApp call to MARTINEZ. MARTINEZ said that he was not around but told CS-1 to contact his brother Anthony.

13. CS-1 then placed a recorded WhatsApp call to ANTHONY LNU. CS-1 asked ANTHONY LNU where they could meet. ANTHONY LNU responded that he would send an address and they could meet soon. Shortly after, ANTHONY LNU sent an address of 40 Federal Street in Lynn. In preparation for the meeting, agents searched CS-1 and the vehicle of CS-1 for drugs, contraband, or unexplained currency, with negative results. CS-1 was given $1,500 in agency funds.

14. Surveillance agents went to the address provided by ANTHONY LNU, which was the location of a Market Basket grocery store. At approximately 3:52 p.m., CS-1 called ANTHONY LNU and said CS-1 was at the meeting location. ANTHONY LNU responded that he would be

there in about five minutes. At approximately 4:03 p.m., CS-1 received a phone call from Anthony LNU directing CS-1 to his location. At this same time, law enforcement observed a Hispanic male in the Market Basket parking lot on his cell phone, looking around the area. Shortly thereafter, law enforcement observed that same man get in the vehicle of CS-1. A few minutes later, the Hispanic male exited CS-1's vehicle and entered the Market Basket. Surveillance agents later followed the Hispanic male to Kirtland Street in Lynn before losing sight of the subject.

15. Agents followed CS-1 to a predetermined meet location. At that location, CS-1 stated that he met with ANTHONY LNU. ANTHONY LNU seemed very nervous and told CS-1 that he needed more time to get the drugs together and would send CS-1 a new address.

16. At approximately 4:36 p.m., CS-1 spoke with MARTINEZ by phone. MARTINEZ told CS-1 that the female needed to deliver the product to Anthony. Shortly thereafter, CS-1 received a WhatsApp message from ANTHONY LNU, which stated "49 Kirtland St., Lynn."

17. CS-1 drove to the area of 49 Kirtland Street to meet with Anthony LNU. At approximately 4:59 p.m., ANTHONY LNU entered CS-1's vehicle. According to CS-1, ANTHONY LNU passed CS-1 a clear plastic bag containing white powder and CS-1 provided Anthony LNU with $1,500. ANTHONY LNU subsequently left the vehicle and walked to the area of 58 Kirtland Street. Surveillance agents could not determine whether he entered the residence. However, approximately fifteen minutes later, surveillance agents saw ANTHONY LNU enter a nearby cab and drive away.

18. Law enforcement followed CS-1 back to a pre-determined meet location. At that location, CS-1 gave investigators the plastic bag containing a white powder that had been provided by Anthony LNU. The white powder was field tested using a TacticID device; it tested positive for fentanyl.

**With the assistance of precise location information from two cellular phones, law enforcement monitors two additional fentanyl purchases from MARTINEZ and ANTHONY LNU by CS-1**

19.     On May 13, 2019, United States Magistrate Judge Donald L. Cabell issued search warrants authorizing law enforcement to ascertain precise location information for the cellular telephones used by MARTINEZ and ANTHONY LNU

20.     On May 16, 2019, CS-1, at the direction of law enforcement, completed a controlled purchase of 50 grams of fentanyl from ANTHONY LNU.  The purchase was arranged by MARTINEZ.  Specifically, on May 16, 2019, at 11:35 a.m., CS-1 called MARTINEZ.  MARTINEZ told CS-1 that he was not in the area and that CS-1 should contact ANTHONY LNU.  Based on the precise location information of MARTINEZ's phone, MARTINEZ was on Block Island in Rhode Island at the time of the phone call between CS-1 and MARTINEZ.  CS-1 then ANTHONY LNU.  ANTHONY LNU told CS-1 that they could meet at the same location as the prior transaction, a Market Basket grocery store.  In preparation for the meeting, agents searched CS-1 and the vehicle of CS-1 for drugs, contraband, or unexplained currency, with negative results.

21.     At approximately 12:32 p.m., investigators saw ANTHONY LNU enter CS-1's vehicle in the Market Basket parking lot.  A few minutes later, ANTHONY LNU exited the vehicle and drove to the area of Kirtland Street in Lynn.  Investigators saw ANTHONY LNU walk into a driveway between 56 and 58 Kirtland Street.  A few minutes later, ANTHONY LNU contacted CS-1 and told CS-1 to meet him at 49 Kirtland Street.  Investigators saw CS-1 drive to the area and ANTHONY LNU enter CS-1's vehicle.  According to CS-1, Anthony LNU passed CS-1 a clear plastic bag containing white powder and CS-1 provided Anthony LNU with $3,000.  Law enforcement followed CS-1 back to a pre-determined meet location.  At that location, CS-1 gave

investigators the plastic bag containing a white powder that had been provided by Anthony LNU. The white powder was field tested using a TacticID device; it tested positive for fentanyl.

22. On June 4, 2019, CS-1, at the direction of law enforcement, completed a controlled purchase of 50 grams of fentanyl from MARTINEZ. Specifically, at approximately 11:10 a.m., CS-1 called MARTINEZ. MARTINEZ told CS-1 to meet him at the Market Basket. In preparation for the meeting, agents searched CS-1 and the vehicle of CS-1 for drugs, contraband, or unexplained currency, with negative results.

23. At approximately 11:26, investigators saw MARTINEZ enter CS-1's vehicle. CS-1 and MARTINEZ then drove to the intersection of Centre Street and Western Ave, where CS-1 dropped MARTINEZ off. MARTINEZ then walked to a nearby parking lot, where he met with ANTHONY LNU and entered a silver Honda CRV. Investigators then conducted surveillance on MARTINEZ and ANTHONY LNU as they drove around Lynn. Based on the precise location information for ANTHONY LNU's cellular phone and surveillance information, MARTINEZ dropped ANTHONY LNU off in the area of Kirtland Street in Lynn between 12:38 p.m. and 1:23 p.m, with MARTINEZ remaining at a barbershop located at 659 Western Ave. At approximately 1:20 p.m., CS-1 told investigators that MARTINEZ said he was waiting in the barbershop for his brother to bring him the product. A few minutes later, investigators saw a Hispanic male matching the description of ANTHONY LNU enter into the barbershop where MARTINEZ was located. At approximately 1:29 p.m., CS-1 told investigators that MARTINEZ was walking over and to meet where CS-1 had dropped MARTINEZ off at earlier. Investigators saw MARTINEZ exit the barbershop and enter CS-1's vehicle. According to CS-1, MARTINEZ passed CS-1 a clear plastic bag containing white powder and CS-1 provided MARTINEZ with $3,000. Law enforcement followed CS-1 back to a pre-determined meet location. At that location, CS-1 gave investigators

the plastic bag containing a white powder that had been provided by MARTINEZ. The white powder was field tested using a TacticID device; it tested positive for fentanyl.

### July 10, 2019 – MARTINEZ sells CS-1 100 grams of fentanyl and investigators identify MARTINEZ's source of supply

24. On July 10, 2019, agents met with CS-1 for the purpose of attempting a controlled purchase of fentanyl from MARTINEZ. At approximately 11:45 a.m., CS-1 placed a recorded WhatsApp call to MARTINEZ. CS-1 told MARTINEZ that CS-1 needed to meet with MARTINEZ because he/she had a customer in the area. MARTINEZ told CS-1 that he did not have a ride and would need to call someone. CS-1 told MARTINEZ that CS-1 could pick MARTINEZ up if necessary. MARTINEZ agreed and sent CS-1 a WhatsApp message with his address in Beverly Investigators were present during this exchange and viewed this text message on CS-1's phone. In preparation for the meeting, agents searched CS-1 and the vehicle of CS-1 for drugs, contraband, or unexplained currency, with negative results.

25. At approximately 12:37 p.m., CS-1 entered the residence of MARTINEZ in Beverly. After a few minutes, CS-1 left with MARTINEZ. According to CS-1, MARTINEZ asked to be dropped off at the barbershop located on Western Ave. in Lynn. CS-1 told MARTINEZ that the customer wanted 100 grams of fentanyl. MARTINEZ told CS-1 that he would have to call someone to bring it.

26. At approximately 1:05 p.m., investigators saw CS-1 drop MARTINEZ off at the corner of Western Ave. and Brookvale St. in Lynn. Investigators saw that MARTINEZ was wearing a white t-shirt. Investigators then met with CS-1 at a pre-determined meet location and provided CS-1 with $6,000 in agency funds. CS-1 then contacted MARTINEZ and told him that

CS-1 had the money. MARTINEZ responded that someone was bringing the drugs and would be in the area in twenty minutes.

27.   At approximately 1:21 p.m., investigators saw MARTINEZ standing by the open passenger door of a black BMW and talking with an occupant of the vehicle.

28.   After twenty minutes had passed, CS-1 called MARTINEZ for an update. MARTINEZ said that the drugs were on the way and that it would be another ten minutes because they had "that" on them and could not drive fast.

29.   At approximately 1:44 p.m., investigators saw MARTINEZ on the phone sitting outside of the barbershop. MARTINEZ was looking up and down the street. A few minutes later, MARTINEZ had moved out of sight. Investigators drove by and observed a white Acura MDX with its running lights on parked across the street from the barbershop. Investigators saw two males with white T-shirts sitting in the vehicle. Shortly thereafter, the white Acura began pulling away from the area. At that same time, CS-1 told investigators that MARTINEZ was bringing the drugs and that CS-1 was to meet MARTINEZ near a local restaurant in Lynn. Investigators saw MARTINEZ walking away from where the white Acura had been parked towards the restaurant, which was located at 60 Market Square.

30.   Investigators saw MARTINEZ enter a Western Union next to the restaurant for a brief moment and then enter CS-1's vehicle outside the restaurant. A few moments later, MARTINEZ exited CS-1's vehicle and started walking away. CS-1 contacted investigators and said that the deal was positive. Investigators followed CS-1 back to a pre-determined meet location. At that location, CS-1 gave investigators the suspected narcotics that had been provided by MARTINEZ.

31.    Meanwhile, investigators maintained surveillance on MARTINEZ. Investigators saw MARTINEZ walk to a nearby liquor store and then continue back to the barbershop. Investigators saw MARTINEZ briefly enter the barbershop and then walking down Western Ave. Investigators then saw the white Acura parked across the street. MARTINEZ entered the white Acura on the passenger side and remained inside for a few minutes before leaving the white Acura and returning to the barber shop.

### August 2, 2019, Narcotics Transaction

32.    On August 2, 2019, agents met with CS-1 for the purpose of attempting a controlled purchase of fentanyl from MARTINEZ. At approximately 12:00 p.m., CS-1 contacted MARTINEZ using What's App to see if MARTINEZ was available to meet. CS-1 told MARTINEZ that he/she had a customer in the area and offered to pick MARTINEZ up. MARTINEZ agreed and sent CS-1 a WhatsApp message with a location in Beverly. Investigators were present during this exchange and viewed this text message on CS-1's phone. In preparation for the meeting, agents searched CS-1 and the vehicle of CS-1 for drugs, contraband, or unexplained currency, with negative results. Investigators also gave CS-1 agency funds to use for the fentanyl purchase. Investigators maintained surveillance on CS-1's vehicle as he/she travelled to Beverly.

33.    At approximately 12:48 p.m., investigators saw MARTINEZ exit his residence in Beverly and enter CS-1's vehicle. According to CS-1, when MARTINEZ got in the car, he said that there was a black Jeep Cherokee that was out of place. On the drive to Lynn, CS-1 said that MARTINEZ continually checked the mirrors and noted that the black Jeep Cherokee appeared to be following them. CS-1 asked MARTINEZ if they were going to the barbershop again, and

MARTINEZ said yes. At approximately 1:00 p.m., CS-1 told investigators that he/s he was driving MARTINEZ to the barbershop.

34.  At approximately 1:18 p.m., investigators saw CS-1 and MARTINEZ arrive at the barbershop in CS-1's vehicle. However, the car abruptly turned around and travelled to a shopping plaza about two blocks away. Investigators saw MARTINEZ exit the vehicle and enter a restaurant, Lechonera Bonano. According to CS-1, MARTINEZ directed him/her to drive to that location immediately upon arriving at the barbershop. Shortly thereafter, investigators saw MARTINEZ leave the restaurant and enter into the silver Range Rover driven by another individual, known to investigators. MARTINEZ was in that car briefly before he and the other individual both exited the vehicle. MARTINEZ went back into the restaurant while the other individual entered a grocery store next door.

35.  At approximately 1:25 p.m., MARTINEZ exited the restaurant and got in CS-1's vehicle. CS-1 and MARTINEZ drove to the area of the barbershop. According to CS-1, upon arriving at the barbershop MARTINEZ gave CS-1 the drugs and CS-1 gave MARTINEZ the money. MARTINEZ told CS-1 that "the guy" had an extra 5 grams since the last time was short and also provided CS-1 with a sample of a new drug. MARTINEZ stated that they had a few kilograms of the new drug if CS-1's customer liked the sample. CS-1 then dropped MARTINEZ off at the barbershop. A few minutes later, CS-1 contacted investigators and said that the deal was positive. Investigators followed CS-1 back to a pre-determined meet location. At that location, CS-1 gave investigators the suspected narcotics, specifically, a clear plastic bag containing a round object wrapped in black tape and a smaller item wrapped in black tape.

CONCLUSION

36.     Based on the foregoing, I believe there is probable cause to believe that from April 2019 until August 2, 2019, MARTINEZ did knowingly conspire to possess with intent to distribute 40 grams or more of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(vi).

I declare that the foregoing is true and correct.

_____
JILL HARDIE
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me,
this 22th day of August, 2019

_____
HONORABLE DONALD L. CABELL
United States Magistrate Judge
District of Massachusetts