# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALVARO MARTINEZ | No. 19-CR-10348-RGS |

## DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY

Defendant, Alvaro Martinez, respectfully moves this Court to release him on conditions, in light of the COVID-19 pandemic and unsafe conditions at the Donald W. Wyatt Detention Facility, where he is currently detained. In light of Warden Daniel Martin's disclosure of a symptomatic, COVID-19 positive detainee on April 21, 2020, counsel for Mr. Martinez submits the Affidavit of Attorney Ashley Allen, which documents the stricken detainee's alarming and widespread exposure throughout the institution's population from April 2 – April 21. [See Exhibit A].

On September 18, 2019, Mr. Martinez agreed to a voluntary order of detention without prejudice [DE 9]. However, at this time, his continued detention risks the health and well-being of Mr. Martinez, who (1) other than misdemeanor motor vehicle offenses has had no criminal convictions in over a decade, (2) has deep personal connections to his partner Zobeida Torres and their children in this area, (3) is a legal permanent resident of the United States, and presents no serious risk of flight. The circumstances of his detention have changed considerably since the time of this Court's voluntary detention order. Detention now presents the risk of serious illness or death, which necessitates temporary release of Mr. Martinez on bail until the pandemic subsides and court and jail functions return to normal.

Mr. Martinez's family and employer remain supportive and, if released, Mr. Martinez would return to live with his family in Beverly, Massachusetts. He is amenable to home detention and virtual check-ins with U.S. Pretrial Services. The alarming health risks posed by detention during the COVID-19 crisis, considered alongside available conditions that would mitigate any risk of danger or flight, merit an order of release for Mr. Martinez.

## FACTUAL BACKGROUND

### A. Personal History

Mr. Martinez is 41 years old. In recent weeks, he has experienced significant swelling in his feet and is concerned about diabetes, for which he has a family history. Despite submitting slips at Wyatt for infirmary care, he has not been seen by medical staff as of the date of this filing. In addition, he reports at least two emergency hospitalizations for respiratory distress within the past five years. Records from North Shore Medical Center have been requested but not received.

Mr. Martinez has resided in the United States since 1999 and is a legal permanent resident. Prior to his arrest he worked full time earning between $3,000 and $4,000 per month. After his arrest he was offered full time employment at a friend's autobody shop. His long-term partner, Ms. Zobeida Torres, remains supportive and wishes for him to live in Beverly, Massachusetts with her and their children if released.

### B. COVID-19 Outbreak and Conditions at the Wyatt Detention Facility

As of April 23, 2020, the new strain of coronavirus, which causes an illness called COVID-19, has infected 2,678,585 people, leading to at least 186,640 deaths worldwide.[1] The

---

[1] Center for Systems Science and Engineering at Johns Hopkins University, "Coronavirus COVID-19 Global Cases Dashboard" (last accessed Apr. 23, 2020), https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6. *See also* World Health Organization, "Coronavirus disease 2019 (COVID-19)

number of people affected by this deadly illness increases exponentially each day.

The Centers for Disease Control and Prevention ("CDC") advises that the virus passes through respiratory droplets when a person coughs, sneezes, or talks.[2] Droplets can land on another person's mouth or nose if they are in close contact (within about 6 feet).[3] It is also possible to catch the virus by touching a surface that has the virus on it and then touching one's mouth, nose, or eyes.[4] The available evidence indicates that the virus may remain on surfaces for up to three days.[5]

Infection can result in pneumonia, multi-organ failure, and in some cases, death.[6] While fatality rates are highest among those over age 75, there is no evidence that age plays a role in catching the virus. In fact, younger adults between ages 20 to 44 comprise 14-20% of adults requiring hospitalization from the virus.[7] The CDC has urged communities to "flatten the curve" so that hospitals are not overwhelmed, which will hopefully result in fewer deaths overall.[8] As of

---

Situation Report" (Mar. 21, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200322-sitrep-62-covid-19.pdf?sfvrsn=f7764c46_2.

[2] *See* CDC, "How It Spreads" (last accessed Apr. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[3] *Id.*

[4] *Id.*

[5] *See* Neeljte van Doremalen, et. al., "Aerosol and Surface Stability of SARS-CoV2 as Compared with SARS-COV-1," New England Journal of Medicine (Mar. 17, 2020), https://www.nejm.org/doi/10.1056/NEJMc2004973 ("SARS-CoV-2 was more stable on plastic and stainless steel than on copper and cardboard, and viable virus was detected up to 72 hours after application to these surfaces (Figure 1A)…").

[6] CDC, "What You Need to Know About Coronavirus Disease 2019 (COVID-19)" Factsheet (last accessed Apr. 17, 2020), https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=22&ved=2ahUKEwiUj_nK-ejoAhWtlnIEHfgGApQQFjAVegQIExAB&url=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fdownloads%2F2019-ncov-factsheet.pdf&usg=AOvVaw3L8vTk2-d0C8lqQ7mthGHs.

[7] CDC, "Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020," https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm#T1_down.

[8] NY Times, "Flattening the Coronavirus Curve" (Mar. 27, 2020), https://www.nytimes.com/article/flatten-curve-

April 8, 2020, at least 45 people in their twenties had died from the virus in the United States, some of whom had no comorbidities or health risk factors.[9]

To combat transmission, the CDC has urged social distancing – every person should remain at a distance of at least 6 feet from every other person.[10] It has issued guidance discouraging public gatherings of any size in areas where there is a substantial level of community transmission.[11] Proper hygiene, including frequent cleaning of all surfaces and frequent, thorough hand washing is also recommended. On April 3, 2020, the CDC issued new guidance recommending the general public to "wear[] cloth face coverings in public settings where other social distancing measures are difficult to maintain (e.g., grocery stores and pharmacies) *especially* in areas of significant community-based transmission."[12]

Leaders across the globe have mobilized to drastically limit the physical interaction of people and the spread of the virus. For example, in Massachusetts, Governor Charlie Baker has enacted emergency orders[13] to close all schools, prohibit on-site consumption of food and beverages, and restrict visitor access to nursing homes. On March 23, 2020, Governor Baker

---

coronavirus.html.

[9] Washington Post, "Hundreds of Young Americans Have Now Been Killed by the Coronavirus, Data Shows" (Apr. 8, 2020), https://www.washingtonpost.com/health/2020/04/08/young-people-coronavirus-deaths/.

[10] Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[11] CDC, "Interim Guidance for Coronavirus Disease" (Mar. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/mass-gatherings-ready-for-covid-19.html.

[12] CDC, "Recommendations for Cloth Face Covers" (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[13] Office of Governor Charlie Baker, "COVID-19 State of Emergency" (last accessed Apr. 17, 2020), https://www.mass.gov/info-details/covid-19-state-of-emergency.

ordered all non-essential businesses to close and directed the Department of Public Health to issue a stay-at-home advisory. That advisory has been extended at least until May 4, 2020.[14] Rhode Island Governor Gina Raimondo similarly issued a stay-at-home order on March 28, 2020, and banned gatherings of more than five people in any public or private space.[15] That order has been extended at least until May 8, 2020.[16]

All of these precautionary measures are designed specifically to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is so highly contagious. However, the measures necessary to mitigating the spread of COVID-19 are unavailable to incarcerated people or those who must interact with them. The large, confined populations at jails make them no better than a cruise ship[17] or nursing home[18] – places where the virus has run rampant. Due to close quarters and common spaces, and minimal provisions for healthcare and hygiene, jails are tinderboxes in which the COVID-19 virus can spread like wildfire, jeopardizing the life and safety of inmates.[19]

---

[14] The Hill, "Massachusetts Governor Extends Stay-At-Home Advisory Through May 4" (Mar. 31, 2020), https://thehill.com/homenews/state-watch/490426-massachusetts-governor-extends-stay-at-home-advisory-through-may-4.

[15] WGBH News, "Rhode Island Governor Issues Strick Stay-At-Home Order" (Mar. 28, 2020), https://www.wgbh.org/news/local-news/2020/03/28/rhode-island-governor-issues-strict-stay-at-home-order.

[16] 7 News, "RI Stay-At-Home Orders Extended to May 8; Providence Parks Closed" (Apr. 7, 2020), https://whdh.com/news/ri-stay-at-home-orders-extended-to-may-8-providence-parks-closed/.

[17] CDC, COVID-19 and Cruise Ship Travel (last accessed March 21, 2020), https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship.

[18] Los Angeles Times, "Seattle-Area Nursing Home Deaths Jump to 13 with COVID-19 and 11 of Unknown Causes" (Mar. 7, 2020), https://www.latimes.com/world-nation/story/2020-03-07/nursing-home-coronavirus-deaths.

[19] Medical professionals behind bars are sounding the alarm. *See* Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020) ("[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day. . . .Please let as many out as you possibly can."). *See also* Jennifer Grannerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20,

The Bureau of Prisons is reporting positive COVID-19 cases among staff and inmates at a shocking rate. The rate of increase of infected people has surpassed the national rate by an enormous degree:[20]



---

2020).

[20] Graph created by the Federal Defenders of New York, available at https://federaldefendersny.org/.

As of April 23, 2020, the BOP has reported **24 federal inmate deaths**, and 556 federal inmates and 342 BOP staff members who have tested positive for COVID-19.[21] The BOP's reported numbers of positive tests are almost certainly lower than the actual number of inmates and staff members who have become infected. This is because the BOP has not instituted mass testing for the coronavirus, and tests remain scarce. For example, the federal penitentiary in Terre Haute, Indiana, which houses between 2,500 and 3,000 inmates, received only four tests as of late March.[22] At the federal prison in Oakdale, Louisiana, where at least seven inmates have died and dozens have tested positive, "correctional officers were told to stop testing people and just assume that anyone with symptoms had been infected[.]"[23] The director of the CDC has reported, however, that as many as 25% of people infected with the coronavirus may not show any symptoms.[24] To illustrate this point: After an inmate tested positive at an Arkansas state prison around April 11, 2020, the corrections department tested all the other inmates housed in that unit. "The state corrections department announced that a whopping 43 of the 46 other men in the housing unit had tested positive. They were all asymptomatic and are now quarantined."[25]

Other state prisons that have widely tested their populations have reported astronomical

---

[21] Federal Bureau of Prisons, COVID-19 (last accessed Apr. 23, 2020), https://www.bop.gov/coronavirus/index.jsp (numbers include those who have recovered after testing positive).

[22] Mother Jones, "Want to Know How Fast Coronavirus Can Spread in Prison? Look at Arkansas" (Apr. 13, 2020), https://www.motherjones.com/coronavirus-updates/2020/04/cummins-unit-prison-arkansas-coronavirus-spread/.

[23] *Id.*

[24] NY Times, "Infected But Feeling Fine: The Unwitting Coronavirus Spreaders" (Apr. 1, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[25] *See supra* n.22.

rates of infection. The New York Times reported on April 8, 2020[26] that the Cook County Jail in Chicago is the largest known source of infections in the United States:

> At least 353 cases can be linked to the jail — more than have been connected to the U.S.S. Theodore Roosevelt; a nursing home in Kirkland, Wash.; or the cluster centered in New Rochelle, N.Y.
>
> The Cook County Sheriff's Office, which operates the jail, said 238 inmates and 115 staff members had tested positive as of Wednesday.

Additionally, on Rikers Island in New York, more than 700 people have have tested positive, including over 440 staff members. One inmate, who was being held on a technical parole violation, died at the jail. In addition, at least six correctional officers have died.[27] The most significant difference between the BOP facilities and these state prisons is in the number of people who have been tested.

The conditions at the Wyatt Detention Facility are no different from the conditions of Rikers or Cook County Jail.  Even after confirmation on April 21 of a COVID-19 positive federal detainee at Wyatt, Alvaro Martinez continues to share a cell with three other men. Inmates who exhibited flu-like symptoms had reportedly been sent to the medical unit without testing, and it is unclear how those individuals are being treated and under what parameters the facility is releasing them back into the general population. Several staff members have self-quarantined at home because they were either out of the country or had been in contact with family members who exhibited signs and symptoms of COVID-19. To sound the alarm, more than 60 immigration detainees at the facility are participating in a hunger strike "calling for their

---

[26] NY Times, "A Jail in Chicago is Now the Largest-Known Source of U.S. Infections" (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-live-updates.html?action=click&module=Spotlight&pgtype=Homepage#link-7634e187.

[27] Newsweek, "More than 700 People Have Tested Positive for Coronavirus on Rikers Island, Including Over 440 Staff" (Apr. 8, 2020), https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872.

release amid concerns about the potential rapid spread of the novel coronavirus through the inmate population."[28]

The fact that Wyatt did not report a positive coronavirus test until April 21 does not mean that no inmates were infected before that date. To the contrary, we now know definitively that at least one COVID-19 infected detainee was present in Wyatt since April 2, associating with every detainee who joined him on the J-1 Intake unit from April 2 until April 17, when he was transferred into general population, until finally being moved to the health services unit on April 21. [See, Affidavit of Attorney Ashley Allen]. The actual number of tests administered to detainees at Wyatt was unknown until April 21, when it was revealed that only 3 detainees out of 580 had received COVID-19 tests.[29]

The fact that Wyatt did not report a positive coronavirus test until April 21 does not mean that inmates at the facility had better means of maintaining social distancing or sanitation. They did not. In the weeks leading up to April 21, inmates shared cells and common areas, eating meals while sitting shoulder-to-shoulder, lining up in close formation to receive food trays and medications, engaging in common area recreation time with contact sports like basketball and exercise in designated workout areas. Personal protective equipment [PPE] was minimal. The facility provided inmates with a single mask approximately two ago, but did not implement any rules regarding whether and when inmates should wear the mask, nor did it provided for the cleaning or replacement of masks.

It also does not mean that the facility had the capacity for mass testing or adequate

---

[28] Providence Journal, "More Than 60 ICE Detainees on 'Hunger Strike' Call for Release from Wyatt" (Apr. 7, 2020), https://www.providencejournal.com/news/20200407/more-than-60-ice-detainees-on-rsquohunger-strikersquo-call-for-release-from-wyatt.

[29] Donald W. Wyatt Status report, 1:20-mc-00004-JJM, D.E. 3, filed April 21, 2020.

medical care. It does not mean that inmates at Wyatt were any safer than inmates at facilities that are experiencing mass outbreaks.

The fact that Mr. Martinez does not have documentation to establish current underlying medical conditions does not mean that he is healthy or somehow immune from contracting the illness, nor does it mean that he would recover quickly. Patrick Jones, the first federal inmate to die from COVID-19 was described by his ex-girlfriend as "healthy as a bull." https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html.

Other judges in this court have recognized the dire risk of detention during this pandemic and have released pretrial detainees from Wyatt to mitigate their risk of severe illness or death. On April 14, 2020, Magistrate-Judge Kelley granted a pretrial detainee's motion for reconsideration of her detention order, allowing temporary release from Wyatt to home confinement for 60 days. *See United States v. Greenan*, No. 1:19-cr-10327, Dkt. No. 44 (D. Mass. April 14, 2020). Like Mr. Martinez, the Ms. Greenan had no underlying medical conditions. She is charged with wire fraud and filing false tax returns for allegedly embezzling money while working as a bookkeeper. At her detention hearing, as in Mr. Martinez's case, the Probation Office recommended detention, and she was detained. Upon her recent motion for reconsideration, Magistrate-Judge Kelley granted temporary release over the government's objection, recognizing that Wyatt is not set up to deal with the highly contagious coronavirus. Judge Kelley noted on the record her concerns about the lack of medical personnel at Wyatt who could monitor symptoms and the impossibility of sheltering-in-place in a jail setting.

Similarly, on April 10, 2020, in *United States v. Nunez*, No. 1:19-cr-10316-LTS (D. Mass. April 10, 2020) (docket entry pending), Magistrate-Judge Bowler released a pretrial detainee who has no medical issues over objections from the government and the Probation

Office. The individual is charged with conspiracy to distribute and to possess with intent to distribute 400 grams or more of fentanyl, a charge carrying a minimum mandatory sentence of ten years, and two related distribution counts. Like Alvaro Martinez, he had originally agreed to voluntary detention without prejudice.

**ARGUMENT**

The Bail Reform Act states that a "judicial officer shall order the pretrial release of the person . . . unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Subsection (c) of the statute mandates that "[i]f the judicial officer determines that the release described in subsection (b) . . . will not reasonably assure [appearance and community safety], such judicial officer shall order the pretrial release of the person . . . subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" *Id.* at § 3142(c).

The current COVID-19 pandemic poses an increased risk to Mr. Martinez if he continues to be detained. The conditions of release recommended by the Probation Office, reconsidered in light of this public health crisis, are sufficient to ensure public safety and Mr. Martinez's appearance in court.

**A. The Bail Reform Act empowers this Court to release Mr. Martinez during the pandemic.**

As an initial matter, the Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984

U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting that "detention prior to trial or without trial is the carefully limited exception" to liberty before trial). The Act calls attention to the presumption of innocence. *See* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence."); *see generally Stack v. Boyle*, 342 U.S. 1, 4 (1951). It follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales-Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake) (citations omitted), *cert. dismissed sub nom.*, *Melendez-Carrion v. United States*, 479 U.S. 978 (1986).

Courts have long recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. As one court recognized, "We do not punish those who have not been proven guilty. When we do punish, we do not act cruelly." *United States v. Scarpa*, 815 F.Supp. 88, 93 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). Thus, even in cases where there is a rebuttable presumption of danger to the community (of which this case is not), release may be appropriate to safeguard a defendant's health and life. *See, e.g*, *id.*; *see also United States v. Cordero Caraballo*, 185 F. Supp. 2d 143, 146 (D.P.R. 2002) (defendant charged with assaulting and attempting to kill federal agent released to custody of his relatives because "[n]otwithstanding the defendant's apparent dangerousness in this case, his present condition is indeed grave and can deteriorate if not carefully treated. At present, the Bureau of Prisons cannot provide the necessary medical care defendant requires.").

This Court should consider the "total harm and benefits to prisoner and society" that the continued pretrial imprisonment of Mr. Martinez would yield, relative to the heightened health

risks posed to Mr. Martinez during this rapidly encroaching pandemic. *See generally*, *United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016) (in sentencing context, observing that a trial judge "cannot close his or her eyes to the conditions a particular defendant . . . will necessarily experience in prison"); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant).

### B. Conditions of release would reasonably assure no serious risk of flight or danger to the community.

The Bail Reform Act requires the Court to impose "the least restrictive [] condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

Mr. Martinez submits that home confinement with his family with virtual check-ins to U.S. Pretrial Services strikes the appropriate balance in protecting his health during the COVID-19 crisis and addressing the Court's concerns of the risk of non-appearance. With respect to dangerousness, Mr. Martinez has pled not guilty and that he remains so until the government proves its case. Now that Massachusetts is under a stay-at-home advisory and interaction with others risks a potentially deadly infection, the risk of future criminal activity is *de minimis*. With respect to Mr. Martinez's risk of flight or non-appearance, the pre-trial services report notes his alleged ties to a foreign country, presumably because he was born in the Dominican Republic.[30]

---

[30] Indeed anyone seeking to travel to the Dominican Republic faces restrictions rendering it virtually impossible to do so. On March 19, the Dominican Republic suspended the arrival of incoming travelers and "effectively closed the borders" of the country for an initial period of 15 days. As of April 22, the Dominican Republic has 5,300 confirmed cases of COVID-19 and 260 confirmed deaths. There is national curfew that prohibits all traffic and movement of people from 5pm to 6am. Roadblocks have been set up at various points throughout the country prohibiting internal travel in the country. U.S. citizens with urgent travel, including travel to the airport for departure, have been advised to be prepared to present supporting documentation to the Dominican authorities at

However, the report cites no examples of any remaining ties to that location such that would render the defendant a risk of non-appearance. Mr. Martinez has lived in the United States for 21 years. He has built a life and an extended family here. For the past 14 years, he has been in a relationship with Ms. Torres, a United States citizen. Together, they have an eleven-year-old son along with Ms. Torres's two other children, whom Mr. Martinez has raised as his own. He has maintained consistent employment and financially supported his family.

Although he potentially faces a 5 year mandatory sentence, Mr. Martinez is Safety Valve eligible. The proposed conditions of home confinement will would reasonably ensure that Mr. Martinez does not present a danger to the public or present a serious risk of flight. It also serves the dual purpose of lending much-needed family support for the Martinez-Torres household. Ms. Torres is a home health aide, requiring her to work outside the home and obtain child care for the couple's son, who is no longer able to attend grade school. Amid the COVID-19 pandemic, the reality is that Mr. Martinez's continued detention presents a danger to himself and other inmates and staff, as well as the public. He respectfully urges the Court to grant his release on conditions.

## CONCLUSION

For the foregoing reasons, Mr. Martinez moves this Court to grant this motion and release him on the conditions set forth above as well as any additional conditions that the Court deems necessary.

## REQUEST FOR HEARING

Defendant requests a hearing on this motion, and to attend via videoconference.

ALVARO MARTINEZ<br>
By his attorneys:

---

each checkpoint. See, Coronavirus Information for the Dominican Republic, updated April 22, 2020. Available at https://do.usembassy.gov/covid-19-information/. Last accessed April 23, 2020.

*/s/ Julie-Ann Olson*
Julie-Ann Olson
B.B.O. # 661464
Samia Hossain
B.B.O. # 696329

Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I, Julie-Ann Olson, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on April 23, 2020.

*/s/ Julie-Ann Olson*